IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

|  |  |  |
|---|---|---|
| DARRELL K. THOMPSON, ) | | |
| WILLIAM T. HOLT (DECEASED), | ) | |
| LEATHA J. HOLT (NEXT OF KIN) | ) | CASE NO.: 2:16-cv-03013 |
| NEWAIR MANUFACTURING, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v | ) | |
| MEDTRONIC, INC., | ) | **JURY DEMAND** |
| PHYSIO-CONTROL INT'L INC. | ) | |
| PHYSIO-CONTROL, INC. | ) | |
| JOLIFE AB/PHYSIO-CONTROL | ) | |
| BAIN CAPITAL INC. | ) | |
| STRYKER CORPORATION | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS MOTION TO DENY BAIN CAPITAL INC MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. RULE 12 (b)

Plaintiffs, respectfully moves the Court to deny Bain Capital Inc., motion to move the Court under Fed. R.

Civ. P. **12**(b) for dismissal of Plaintiffs Darrell K. Thompson, William T. Holt (Deceased), Leatha J. Holt

(Next of Kin) and NewAir Manufacturing LLC (Collectively, "Plaintiffs") complaint on the grounds that

Plaintiffs have failed to establish personal jurisdiction over Bain and have failed to state a claim upon

which relief can be granted.

A Memorandum in Support of Plaintiffs move to deny Bain Capital Inc's Motion to

Dismiss is filed herewith.

1

Respectfully submitted,

Larry E. Fitzgerald
FITZGERALD, HARRIS &
FITZGERALD

44 N. Second, Suite 201

Memphis, TN 38103

Attorney for the Plaintiffs

DARRELL K. THOMPSON,
WILLIAM T. HOLT (DECESASED),
LEATHA J. HOLT (NEXT OF KIN)
NEWAIR MANUFACTURING, LLC

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 6 , 2017, a copy of the foregoing was

filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing

system to all parties indicated on the electronic filing receipt, including the individuals listed

below. Parties may access this filing through the Court's electronic filing system.

Larry E. Fitzgerald
FITZGERALD, HARRIS &
FITZGERALD
44 N. Second, Suite 201
Memphis, TN 38103
*Attorney for Plaintiff*

Christopher L. Vescovo
LEWIS, THOMASON, KING, KRIEG &
WALDROP, P.C.
2900 One Commerce Square
40 South Main Street
Memphis, TN 38103

Annie T. Christoff
Andrew J. Rittenhouse
BASS, BERRY & SIMS, PLC
100 Peabody Place, Suite 1300
Memphis, TN 38103
*Attorneys for Defendant, Bain Capital, Inc.*

B. Trent Webb, by special appearance
John D. Garretson, by special appearance
Lynn C. Herndon, by special appearance
SHOOK, HARDY & BACON LLP
2555 Grand Boulevard
Kansas City, MO 64108
*Attorneys for Defendants Stryker
Corporation, Physio-Control International,
Inc., Physio-Control, Inc., and Jolife AB*


s/ Larry E. Fitzgerald

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| DARRELL K. THOMPSON, | ) | |
| WILLIAM T. HOLT (DECESASED), | ) | |
| LEATHA J. HOLT (NEXT OF KIN) | ) | CASE NO.: 2:16-cv-03013 |
| NEWAIR MANUFACTURING, LLC | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| MEDTRONIC, INC., | ) | **JURY DEMAND** |
| PHYSIO-CONTROL INT'L INC. | ) | |
| PHYSIO-CONTROL, INC. | ) | |
| JOLIFE AB/PHYSIO-CONTROL | ) | |
| BAIN CAPITAL INC. | ) | |
| STRYKER CORPORATION | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS'MOTION TO DENY DEFENDANT BAINCORPORATION'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. RULE 12(b)**

TABLE OF CONTENTS

Introduction

**Introduction : Plaintiffs' <u>RESPONSE TO</u>** "Bain Capital Inc ", **<u>pages 1-11 Motion to Dismiss, Plaintiffs</u>** **<u>Request</u>** Bain Capital Inc **<u>motion to be DENIED</u>** allegations regarding Personal, General and Specific Jurisdiction **motion to dismiss be denied** regarding allegation Failure to state a claim of relief for correction of Inventorship not having merit. Read Summary Introduction Explain Reason For Correction of Inventorship & Unjust  Enrichment ; also Read Plaintiffs Respond to Medtronic Inc Motion to Dismiss.................................................................................................................................. 1-24

**Plaintiffs' <u>RESPONSE TO</u>**"Bain Capital Inc " **<u>pages 1-20   Motion to Dismiss, Plaintiffs request their</u>** **<u>motion to be DENIED</u>** allegations regarding Failure to state a claim for Relief for Correction of Inventorship & "Unjust Enrichment" ..... ….……..............................................................................5- 15

Plaintiffs' <u>**RESPONSE TO**</u> "Bain Capital Inc "pages 1-20 **<u>Motion to Dismiss, Plaintiffs request</u>** Stryker Defendants **<u>motion to be DENIED</u>** allegations regarding undefined collaboration "Correction of Inventorship/ Joint Inventorship" ............................................................................................1-23

Plaintiffs'**<u>RESPONSE TO</u>**" Bain Capital Inc " pages 1-20 **<u>Motion to Dismiss In Its Entirety, Plaintiffs</u>** **<u>request</u>** Bain Capital Inc.' **<u>motion to be DENIED</u>** allegations regarding unjust enrichment, Trade Secrets, Misappropriation of Trade Secrets, violation of implied contract, correction of inventorship  ...1-13

Argument .................................................................................................................23

Conclusion ......................................................................................................... 24

**IN RESPONSE TO PLAINTIFFS' MOTION TO DENY DEFENDANTS BAIN CAPITAL INC., MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. RULE 12(b) INTRODUCTION, BACKGROUND, pages 1-20**

Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

(1) lack of subject-matter jurisdiction;

(2) lack of personal jurisdiction;

(3) improper venue;

(4) insufficient process;

(5) insufficient service of process;

(6) failure to state a claim upon which relief can be granted; and

(7) failure to join a party under Rule 19.

The Plaintiffs has to assume that since BAIN CAPITAL INC. did not assert any specific above defenses motions to dismiss that he is making a blanket on none of them. The Plaintiffs is requesting that BAIN CAPITAL INC. motion to dismiss pursuant to Fed. R. Civ. P. Rule 12 (b) be denied.

1. Thus the court should not dismiss this case against the Defendant for lack of personal jurisdiction because the evidence shows that none is warranted. Plaintiffs request a denial of Defendant motion to dismiss.
2. Plaintiffs did not fail to state a claim of relief Plaintiffs unjust enrichment claim is not preempted by Federal patent law. Plaintiffs request a denial of Defendant motion to dismiss.
3. Inventorship issues. Plaintiffs request a denial of Defendant motion to dismiss.
4. The Plaintiffs deny the defendants motion to dismiss Plaintiffs Complaint in its entirety. Plaintiffs have presented factual allegation to support the exercise of personal Jurisdiction. Plaintiffs request a denial of Defendant motion to dismiss.

The Plaintiffs move to deny Bain Capital Inc. move not to be subject to personal jurisdiction in Tennessee. Plaintiffs move that the Defendants be subject to personal jurisdiction in Tennessee.

The Plaintiffs deny Bain Capital Inc. regarding Plaintiffs not stating a claim for relief. The Plaintiffs deny Bain Capital Inc. statement regarding Plaintiffs' unjust enrichment claim is preempted by federal patent law and Plaintiffs having not sufficiently pleaded a claim for correction of inventorship.

## PLAINTIFFS RESPPONSE REQUEST FOR DENIAL OF BAIN CAPITAL INC. MOTION TO DISMISS DUE TO JOURISDICTION

Bain Capital Inc. Private, Limited Partnership, located on 200 Clarendon Street Boston, Massachusetts,

U.S. was founded as Private Equity firm in Boston. Bain Capital Private Equity is one of the leading investors in the Healthcare sector.  There global platform allows them to identify industry best-practices and help companies compete on a global scale, while there significant local presence provides insight into unique local markets.  Their deep historical experience in this space includes investments in hospitals, pharmaceuticals, medical products manufacturers, distributors and service providers. Their extensive experience across the healthcare value chain allows them to better and more rapidly understand and support their management teams in the face of the key trends affecting the sector.

Bain Capital Inc. is advertising on the internet and BAIN CAPITAL INC just sold Physio-Control Inc/Jolife AB and Physio-Control international to Stryker Inc. for 1.28 billion dollars. Physio-Control which own Jolife AB was owned by Bain Capital last year. Those companies are now owned by Stryker Inc. which was register last year and it is currently register this year in Tennessee as an active business.

## Rule 12(b)(2) - Lack of Personal Jurisdiction

1. "'Jurisdiction' refers to 'a court's adjudicatory authority.'" *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 160 (2010) (citing *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)). "The term 'jurisdictional' properly applies only to 'prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction)' implicating that authority." *Id.*

2. Personal jurisdiction refers to the court's adjudicatory authority to exercise its power over the person subject to suit.

a. Specific jurisdiction refers to the situation when the suit "aris[es] out of or relate[s] to the defendant's contacts with the forum." *Daimler AG v. Bauman*, 134 S.Ct. 746, 754 (2014) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8 (1984)); *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853(2011)("Adjudicatory authority is 'specific' when the suit 'aris[es] out of or relate[s] to the defendant's contacts with the forum.").

b. General jurisdiction refers to continuous and systematic contacts with a state that are "so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Daimler*, 134 S. Ct. at 754 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945)).

The court may determine the jurisdictional issue either with or without conducting an evidentiary hearing. *See Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241-42 (5th Cir. 2008). The nonmovant's burden of proof varies depending on whether the court conducts an evidentiary hearing or not.

The Plaintiffs respectfully request that the proper procedure is followed to truly determine correct jurisdiction. Plaintiffs have not had time to fully investigate whether or not the Defendants in this case fall under personal jurisdiction but the Plaintiffs have discovered that Bain Capital Inc. advertises on the internet displaying its different product lines, contact information and sales. This company has founded 1984 companies as a private equity firm and they have extended their approach across asset classes to include public equity, credit and venture capital. They have leverage their shared platform to capture cross-asset class opportunities in strategic areas of focus never ending or changing, occurring repeatedly, so frequent as to seem endless and uninterrupted. The Plaintiffs also noticed that BAIN CAPITAL INC have always had a close relation with the other Defendants in the suit, Medtronic Inc., Physio-Control Inc/Physio-Control Int'l Inc. Physio-Control/Jolife AB, Stryker Corporation.  The BAIN CAPITAL INC, Stryker Defendants, and Medtronic Inc. are involved in the manufacturing and sale of Medical Device type products which are sold worldwide. This behavior along creates interstate consumer commerce. These products are sold to the general public, hospital and other first responders require those companies to meet strict FDA, OSHA and other guidelines which are governed and regulated by Congress and the Federal Court System.

**Jurisdiction:** No diversity of citizenship is required. Federal courts have original federal jurisdiction over claims brought, so long as the trade secrets at issue are "related to a product or service used in, or intended for use in, interstate or foreign commerce."

Thus, respectfully this Court should not dismiss this case because Bain Capital Inc. is subject to personal jurisdiction.

Summary Introduction, History will explain Plaintiffs response to deny BAIN CAPITAL INC. motion to dismiss through Plaintiffs response to deny Medtronic Inc. motion to dismiss regarding unjust enrichment, Misappropriation of trade secrets and correction of inventorship and sole and/or joint inventorship.

See Exhibit A

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiffs hereby submit its opposition to Defendants' Motion to Dismiss the Complaint with Prejudice. Complaint not only meets but exceeds the standards governing the form of a complaint contemplated by Federal Rule of Civil Procedure 8(a), this Court has subject matter jurisdiction in this matter, and the Complaint sufficiently alleges the claims of misappropriated trade secrets, unjust enrichment, and correction of inventorship accordingly, All Defendants' motion should be denied.

### Summary Introduction

Plaintiffs Darrell K. Thompson, William T. Holt (deceased), Leatha J. Holt, and New Air Manufacturing, LLC ("New Air") (collectively, "Plaintiffs") seek correction of inventorship of U.S. Patent No. 7,841,996 ("the '996 patent") that was assigned to Defendant Jolife AB. The new assignee of the "996 patent" is Physio-Control/Physio –Control International and their new owner is Stryker Corporation. The Plaintiffs are also seeking a finding of **unjust enrichment** based on valuable goods and services provided to and received by Medtronic Inc. in the form of trade secrets. Medtronic Inc. had a reasonable understanding that when the Plaintiffs providing those goods and services to Medtronic Inc. and Medtronic Inc. accepted those goods and services; the Plaintiffs were expecting to be compensated. The circumstances demonstrate that it would be unjust for Medtronic Inc. and the other Defendants (listed in the Complaint) to retain Plaintiffs goods and services without payment. The valuable goods and services were documented in a confidentiality letter addressed to both Medtronic Inc.  Representatives (Mathew Morrison and Darrel Untereker) on Tuesday, October 22, 2002 and disclosed to Medtronic Inc. through telephone conversation between Medtronic Inc. Representatives and Thompson. That information was not obtained illegally by Medtronic Inc. but Medtronic Inc. failed to exercise reasonable care or competency in keeping the information secret.  Medtronic Inc. disclosed, used and shared that

information with others without the Plaintiffs consent; resulting in that information being written in "996 patent" claims. The "996 patent" was assigned to Jolife AB. The Plaintiffs technology was used by Jolife AB to development the Lucas Chest Compression Device Stabilization Strap.

The Plaintiffs' Complaint shows a comparison of their " 499 patent" claims and specifications to the named inventor "996 patent" claims. It shows that the "996 patent "claims are similar or identical to the Plaintiffs "499 patent" claims.

Also in the Plaintiffs' Complaint, it shows their "499 patent" date which was filed before the named inventors "996 patent". The Plaintiffs conception and reduction to practice is verified through their issued "499 patent".

**Collaborations** can be in different forms or types. Thompson never stated that he and the Late Mr. Holt never communicated with the named inventors of the "996 patent", nor did he say that the Plaintiffs were never familiar with those inventors works. The Plaintiffs have stated all along that their trade secrets which included intellectual rights, Know-How-Information and other information written in the two letters regarding Newair Manufacturing LLC business were provided to others including those inventors. Those inventors became familiar with the Plaintiffs work.

Thompson Know –How- Knowledge started with a conversation about his experience in law enforcement and being CPR Certified. Thompson told the Medtronic Inc. Representatives about his experience as a Uniform Officer for the Memphis Police Department while working the Midnight shift, 1983. Thompson told the following story;

Thompson and a Memphis Fire Department Paramedics arrived on the scene of a one car accident with a single passenger driver (female). The driver was inside the vehicle unconscious due to her vehicle hitting a large iron pole located east of Goodlett Ave. and south of Southern Ave. near the intersection. During, that scene, Thompson observed the paramedic using a Thumper Device on the victim. Thompson asked the paramedic about the Thumper Device and the paramedic replied that the device didn't stay on the sternum area during chest compression, it would move around. Thompson will always remember that incident because the paramedic stated that sometimes they would have to open the chest of the victims and massage their hearts.

So, when Mr. Holt approached Thompson in late 1998 and early 1999 with his U.S. Patented Mechanical Resuscitator 5009226 and his U.S. Patented Hull Hole Closure for an Oil Tanker Device 5009180, Thompson was interested. Thompson and his wife Phyllis Thompson signed an agreement with William T Holt and his wife Leatha J. Holt on June 22, 1999.

See Exhibit B

Approximately seven months after the student's presentation, Thompson responded to Medtronic Inc. earlier solicitation and talked over the phone. Thompson told the Medtronic Inc. Representatives the usage of the technology (chest compression device and neck pillow support) and its unique benefits and

how the technology can solve problems associated with CPR. It was explained that the neck pillow support would Not only support the neck and prevent head, neck and possible spinal cord injury; but, it

Page 4

was also design to keep the head tilted and airway open at all times. It was design with another advantage, the attachment. The attachment of the pillow support, to the base of the CPR device using an attachment, would allow the user to carry all the parts together to the desired location. It would also limit the movement of the Chest Compression device when in use. The weight of the patient's upper back and lower neck; positioned one the neck pillow support would secure the neck pillow support and the string attachment would prevent the chest compression device from moving from the sternum.

The pillow support attachment and additional information was mentioned in the letters. The Know-How- Knowledge regarding its method, usage, material and the advantages over other CPR Devices were not in the letters.

Thompson told Medtronic Inc. Representatives these things because he was convinced that Medtronic Inc. was truly interested. Thompson felt that he had only one chance to convince Medtronic Inc. to provide funding to get the company up and running; or to sign some type of partnership agreement.

The Lucas Chest Compression Device is being sold in the United States and other countries. Federal courts have original federal jurisdiction over claims brought, so long as the trade secrets at issue are "related to a product or service used in, or intended for use in, interstate or foreign commerce."

See Exhibit C

**In Rawlings v. John Hancock** Mutilife Inc. Co., 78 S.W. 3d 291, 300 (Tenn. Ct. App. 2001) even under today's relaxed rules of pleading it is necessary to include enough facts in a complaint to articulate a claim of relief.  The Plaintiffs in this case have set cognizable claims for relief that should be granted. Medtronic Inc. motion to dismiss this case should be denied. Plaintiffs' case should not be dismissed.

**IN RESPONSE TO MEDTRONIC INC. INTRODUCTION AND PARAGRAPH TWO (2) ON PAGE 1 OF 19 AND MEDTRONIC INC. "Plaintiffs' allegation's regarding joint inventorship" on PAGE 9 & 10 OF 19**

The Plaintiffs are not alleging that they never communicated with the named inventors of the "996 patent". The Plaintiffs are stating that based on the facts that have been presented in their complaint and based on facts that will be presented in court, it will show a line of communication between the Plaintiffs', the defendants and the named inventors.

The defendant (Medtronic Inc.) in their motion to dismiss wrote "But Plaintiffs do not allege that Mr. Thompson or Mr. Holt ever collaborated with the actual "996 "patent inventors, Mr. Sebelius and Ms. Rosell. (D.I.1, Ex. 2, Compl, 13, 15, 30, 31, 44)"" Plaintiffs do not allege that they worked with Mr. Sebelius or Ms. Rosell, or even that they ever spoke to each other. (ID. and the defendant."

In fact throughout Medtronic Inc. explanation of why they believe; Plaintiffs fail to state a claim for **joint inventorship**, is based entirely around whether or not the Plaintiffs had any direct communication or direct collaboration between Plaintiffs and the named inventors or whether or not the plaintiffs had an

open line of direct communication or direct collaboration with the named inventors. This is totally misleading and that is not the only form of communication or collaboration and that is not the only type

of communication or collaboration that can occur. There are other requirement that must be established under 35 U.S.C & 256 and Section 256 and Section 116 of Title 35.

**In other words,**

"[f]or persons to be joint inventors under Section 116, there must be some element of joint behavior, such as collaboration or working under common direction, one inventor seeing a relevant report and building upon it or hearing another's suggestion at a meeting." *Kimberly-Clark Corp.v.Procter& Gamble Distrib. Co.,* 973 F.2d 911, 916-17, 23 USPQ2d 1921, 1925-26 (Fed. Cir. 1992); *Moler v. Purdy,* 131 USPQ 276, 279 (Bd. Pat. Inter. 1960) ("it is not necessary that the inventive concept come to both [joint inventors] at the same time")".

Under 35 U.S.C. § 256; Section 256 creates a cause of action in the district courts for correction of non-joinder of an inventor on a patent provided the non-joinder error occurred without deceptive intent. See 35 U.S.C. § 256 (2000) (permitting correction of inventorship "[w]hen ever . . . through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part"); MCV, Inc. v. King-Seeley Thermos Co., 870 F.2d 1568, 1571 (Fed. Cir. 1988) (holding that deceptive intent in failing to join an inventor would not permit correction of inventorship under section 256 and could invalidate the patent).[4]

In a section 256 proceeding, "[t]he inventors as named in an issued patent are presumed to be correct." Hess v. Advanced Cardiovascular Sys., Inc., 106 F.3d 976, 980 (Fed. Cir. 1997). The general rule is that a party alleging misjoinder or non-joinder of inventors must meet the heavy burden of proving its case by clear and convincing evidence, see id. (citing Garret Corp. v. United States, 422 F.2d 874, 880 (Ct. Cl. 1970)),[5] and must provide evidence to corroborate the alleged joint inventor's conception, see Ethicon, Inc. v. United States Surgical Corp., 135 F.3d 1456, 1461 (Fed. Cir. 1998) (holding that "an alleged co-inventor must supply evidence to corroborate his testimony" of conception)

Section 116 of Title 35 is the statutory locus of joint inventorship doctrine. It provides that a person not listed on a patent need not demonstrate that he made a contribution equal in importance to the contribution made by the listed inventors to claim his right to joint inventor status. See 35 U.S.C. § 116 (2000) ("Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent."). In fact, section 116 "sets no explicit lower limit on the quantum or quality of inventive contribution required for a person to qualify as a joint inventor." Fina Oil & Chem. Co. v. Ewen, 123 F.3d 1466, 1473 (Fed. Cir. 1997). However, a long

line of decisions in this court holds that a person is a joint inventor only if he contributes to the conception of the claimed invention. See, e.g., C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1352 (Fed. Cir. 1998); Fina Oil, 123 F.3d at 1473 ("The case law thus indicates that to be a joint inventor, an individual must make a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention."); Sewall v. Walters, 21 F.3d 411, 415 (Fed. Cir. 1994); see also Burroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d 1223, 1227-28 (Fed. Cir. 1994) ("Conception is the touchstone of inventorship, the completion of the mental part of invention."). The line between actual contributions to conception and the remaining, more prosaic contributions to the inventive process that do not render the contributor a co-inventor is sometimes a difficult one to draw. Contributions to realizing an invention may not amount to a contribution to conception if they merely explain what was "then state of the art," Hess, 106 F.3d at 981, if they are too far removed from the real-world realization of an invention, see, e.g., Garret Corp., 422 F.2d at 881 ("One who merely suggests an idea of a result to be accomplished, rather than means of accomplishing it, is not a joint inventor."), or if they are focused solely on such realization, see, e.g., Ethicon, 135 F.3d at 1460 ("[O]ne does not qualify as a joint inventor by merely assisting the actual inventor after conception of the claimed invention.").

**Equitable Inventorship correction claims** must be resolved after factually-overlapping fraud claim. Legal issues must precede the bench trail on inventorship when legal issues have a common issue of facts with the inventorship. In Shum v. Intel Corp. Similar cases.

The Supreme Court considered a similar issue in Beacon Theaters v. Westover, Dairy Queen Inc. V. Wood.

**Beacon Theatres, Inc. v. Westover, 359 U.S. 500 (1959)** There, the Court held that "only under the most imperative circumstances . . . can the right to a jury trial of legal issues be lost through prior determination of equitable claims." Similarly, in *Dairy Queen, Inc. v. Wood*, **369 U.S. 469 (1962)** the Court held that when equitable and legal claims share common factual issues, "the legal claims involved in the action must be determined prior to any final court determination of [the] equitable claims."

Medtronic Inc. motion to dismiss Plaintiffs claim for correction of Inventorship on the "996 patent" should be denied. Plaintiff case should not be dismissed.

**IN RESPONSE TO MEDTRONIC INC. INTRODUCTION AND PARAGRAPH THREE (3) ON PAGE 1 OF 19 AND MEDTRONIC INC. "Plaintiffs allegation regarding the sharing of alleged "trade secrets"" ON PAGE 7 & 8 OF 19 and "Plaintiffs' allegations regarding undefined "trade secrets"" ON PAGE 8 &9 OF19.**

**THIS RESPONSE WILL ANSWER BAIN CAPITAL INC   Page 11, IV, Page 12-15, A, B & C Topic and Pages 15-20, 1 & 2 Topic.**

Medtronic Inc. motion to dismiss Plaintiffs' unjust enrichment claim should be denied because it is not preempted by Tennessee Uniform Trade Secret Act ("TUTSA").

**The Tennessee Uniform Trade Secrets Act, Tenn. Code Ann. § 47-25-1701** et seq, recognizes a claim for misappropriation of trade secrets, which are defined as:

[I]information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:

(**A**) Derives independent economic value, actual or potential, from not being generally known to, and not being readily accessible by proper means by other persons who can obtain economic value from its disclosure or use; and

(**B**) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

See Exhibit  D

**One U.S. federal court has described trade secrets as follows:**

 "A trade secret is really just a piece of information (such as a customer list, or a method of production, or a secret formula for a soft drink) that the holder tries to keep secret by executing confidentiality agreements with employees and others and by hiding the information from outsiders by means of fences, safes, encryption, and other means of concealment, so that the only way the secret can be unmasked is by a breach of contract or a tort." Con Fold Pac. v. Polaris Indus., 433 F.3d 952, 959 (7th Cir. 2006) (citations omitted). "

 'The U.S. Supreme Court in Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470 (1974), held that state trade secret laws are not preempted by either the Patent Clause of the U.S. Constitution (Article I, §8, cl. 8) or the federal patent statute (35 U.S.C. §§101 et seq.) '

**Plaintiffs' trade secrets**: were information regarding their non published patent application "499 Patent", prototype, research documents, drawings, final design drawings, time line, specifications, descriptions "SECRECY/NON DISCLOSURE AND NON USE AGREEMENT", Thompson knowhow knowledge regarding the new technology and its unique concept (improvements that included the sternum means and neck positioning means (neck pillow support) with its attachment to the base of the CPR Device), methods, NewAir Business Plan, contact information, advantages and vision for the future.

Plaintiffs asserted that although they lacked privities of contract with Medtronic Inc. ,Physio-control/Physio-control International, Jolife AB, Bain Capital and Stryker Inc, Plaintiffs were nonetheless entitled to recover from services performed, benefits received which benefited Medtronic Inc. and others under the quasi-contractual theory unjust enrichment.

**Castelli v. Lien 910 S.W.2d 420 (Tenn. CT. App.1995) "Unjust Enrichment"**

"**Quantum meruit** actions are equitable substitutes for contract claims. They enable parties who have provided goods and services to another to recover the reasonable value of these goods and services when the following five circumstances exist:

(1) there must be no existing, enforceable contract between the parties covering the same subject matter, Robinson v. Durabilt Mfg. Co., 195 Tenn. 452, 454-55, 260 S.W.2d 174, 175 (1953); (2) the party seeking recovery must prove that it provided valuable goods and services, Moyers v. Graham, 83 Tenn. 57, 62 (1885); Wrinkle v. J.F. Larue & Son, 9 Tenn. App. 161, 165-66 (1927); (3) the party to be charged must have received the goods and services, Paschall's, Inc. v. Dozier, 219 Tenn. 45, 54, 407 S.W.2d 150, 154 (1966); Jaffe v. Bolton, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991); (4) the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated, V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd., 595 S.W.2d 474, 482 (Tenn. 1980); and (5) the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them. Pascall's, Inc. v. Dozier, 219 Tenn. at 54, 407 S.W.2d at 154; Reprise Capital Corp. v. Rogers Group, Inc., 802 S.W.2d 608, 610 (Tenn. Ct. App. 1990)."

The information (trade secret) was not generally known to Medtronic Inc. and the other defendants.

**The Plaintiffs took the following precaution to protect their trade secrets;**

1. One person was responsible for maintaining the secrecy. That person was Thompson.
2. Those trade secrets were secured at Thompson's home which had locks and a monitored home security system.
3. One home computer that contained antivirus and theft protection.
4. Information was protected through signed "**SECRECY/NON DISCLOSURE AND NON USE AGREEMENTS**"
5. Documents were marked with the word confidential if they contained trade secret information that was being presented.

Whether information qualifies as a "trade secret" under federal or state law is a question of fact that may be determined by a jury.11 4-15 ROGER M. MILGRIM, MILGRIM ON TRADE SECRETS §15.01.

**In August of 2001,** Darrell K. Thompson Representative for Newair Manufacturing LLC (Newair) sent a letter dated **August 7, 2001** to Mr. Bernard B. Beard, PhD Assistant Professor Mechanical Engineering Department at Christian Brother University. The letter was a request from Newair to participate in the Industry Sponsored Design Projects Selection Process for **next year (2002)**. The letter included a design application for a mechanical resuscitator along with a list of tasks for the students to perform. No trade secret information was presented in that letter.

See Exhibit E

After the students selected the Plaintiff's Project Request, Thompson met with the following Representatives from Christian Brother University on **October 4, 2001**;

Page 9

<u>They signed the Plaintiffs **"SECRECY/NON DISCLOSURE AND NON USE AGREEMENT"**.</u>

1. Mark A. Driver, Chairman Mechanical Engineering Department. Time signed 1:27 pm.
2. Brother Louis Althaus, Vice President at Christian Brother University. Time signed 1:30 pm,
3. Bernard B. Beard, Associate Professor Mechanical Engineering Department. Time signed 1:30 pm.

Copies of the **"SECRECY/NON DISCLOSURE AND NON USE AGREEMENT"** are attached.

See Exhibit F

Thompson met with the following Senior Engineering Students on October 8, 2001;

<u>They signed the Plaintiffs **"SECRECY/NON DISCLOSURE AND NON USE AGREEMENT"**.</u>

1. Jason J. Diniz from India. Time signed 6:25 pm.
2. Michael Brunges from United States. Time signed 6:33 pm.

Copies of the **"SECRECY/NON DISCLOSURE AND NON USE AGREEMENT"** are attached.

See Exhibit G

No trade secret Information was presented during that meeting. The students based their design on technology that was patented on April 23, 1991, US Patent 5,009,226; (226 patent) by inventor William T. Holt.

Thompson advised the students and professor in March 2002 that the students could not give a public presentation because the patent attorney hadn't file Thompson and Holt, US Patent Application. The school was preparing to have the students give a private presentation, if the patent application hadn't been filed before March 23, 2002.

Thompson did not provide the student with any of the trade secret new technology regarding the Mechanical Resuscitator until later. Thompson wanted the student to come up with their own design and concept drawing regarding Mechanical CPR Technology.

Thompson provided the students with a single drawing, after the students completed their project report that included their own design and concept drawings and after Thompson saw that it was different from what was going to be placed in the Plaintiffs US patent application.

See Exhibit H

Thompson contacted the students on Monday, March 22, 2002 and advised them that the U.S. patent application had been filed by the Plaintiff's Attorney. The students were given the green light to give a public presentation, on Tuesday, March 23, 2002.

The Senior Engineering Students at Christian Brother University gave their presentation to a specific group of people; engineering students, their families, friends, faculty and the different industry advisors.

The students based their design on technology that was patented on April 23, 1991, US Patent 5,009,226; (226 patent) by inventor William T. Holt.

The new technology to the Mechanical Resuscitator was filed in a non-published U.S. Patent Application on March 22, 2002 and later issued "499 patent" on January 24, 2006. Darrell K. Thompson and the late William T. Holt are listed as the inventors, assigned to Newair.

The students did not present the Plaintiff's new technology that was filed in the Plaintiffs unpublished patent application, regarding specific specifications, specific detail descriptions, final patent drawings, claims and know how knowledge.

The students mentioned and presented a sternum ball and headrest which was designed totally different from the sternum means and neck positioning means that is documented in the Plaintiffs "499 patent".

The sternum means in the non published patent application had a curved to simulate the heal of a hand and not flat at the base like the sternum ball presented by the students and documented in their written report. The students never design a neck position means and/or neck pillow support with the string means attached to the base of their device. The students designed a headrest.

The student did present the single drawing that Thompson had provided the students earlier. That drawing was presented briefly during the student's presentation and documented in their final report. That drawing is not the same drawing that is recording on the Plaintiffs "499 patent". The students never showed the single drawing that Thompson provided nor did they show their completed design device drawing being used on a patient in order to get a visual perception how it would look on a patient and how it would work. The students never explained or identified the different parts on the drawing.

On May 7, 2002, a copy of the students completed Mechanical Engineering Department's Senior Design Project Number ME 407/408 was filed at Christian Brothers University Main Library. A copy was given to the Plaintiffs.

See Exhibit I

On Tuesday April 16, 2002, the students attended the 6th Annual CBU Student Research Poster Session, located at the school.

See Exhibit J

Private and non commercial use is not a public use. The student's report is in the library archives and can that report be located.  Section 35 USC 103 will determine whether what was presented briefly was private or public based on the courts analyses.

Page 11

See Exhibit K

Medtronic Inc. has presented throughout their motion to dismiss that Plaintiffs or Thompson made one way transmission of information to Medtronic –that Plaintiffs also made publicly available or their complaint is vaguely references to trade secrets, know how [sic] knowledge and the technology and that information is not a trade secret because it was made public.

"Even information that is in the public domain, and thus having no independent economic value, can be protectable to the extent that it is combined with other non-public information to form a trade secret. *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561 (Tenn. Ct. App. 2001) (if portions of information are publicly known, the integration of those portions into a unitary whole may still be protectable). As one commentator has put it, "[t]he fact that some or all of the components of the trade secret are well known does not preclude protection for a secret combination, compilation, or integration of the individual elements." The Connecticut Supreme Court in *Elm City Cheese Co. v. Federico*, 752 A.2d 1037 (Conn. 1999), determined that a "plaintiff's ability to combine these elements into a successful . . . process, like the creation of a recipe from common cooking ingredients is a trade secret entitled to protection."

Christian Brothers Students, Jason Diniz and Michael J. Brunjes, Cardiopulmonary Resuscitation Development and Design Device was so unique that Thompson suggest that Newair enforce the clause in the Students SECRECY/NON DISCLOSURE AND NON USE AGREEMENT requiring them to assign their intellectual rights to their design CPR device over to Newair. On February 24, 2003, the Plaintiffs file a U.S Design Patent Application and Newair received the issued design patent on January 5, 2005.

This is additional evidence that the Plaintiffs trade secret regarding their technology was not in the public domain.

See Exhibit  L

On Monday, May 27, 2002 a letter was sent to Christian Brothers University President, Brother Stan Sobccyk, praising faculty, students and the program.

See Exhibit M

The information that was provided to Medtronic Inc. Representatives in two (2) letters contained trade secrets. The word confidential was written at the end of the letter. The confidential letter was dated Tuesday, October 22, 2002 and it was mailed to Darel Untereker and Mathew M. Morrison. Those confidential letters should be in the possession of Medtronic Inc.

See Exhibit N

On Monday, February 10, 2003 and Tuesday, February 11, 2003, Thompson attempted to Kinko's fax a letter and a signed **"SECRECY/NON DISCLOSURE AND NON USE AGREEMENT"** form to  Medtronic Inc. Representative, Darel Untereker on Monday, February 10, 2003 but the fax failed, so it was mailed the following day to him.

See Exhibit  O

On Wednesday, March 19, 2003 Thompson sent this letter because Medtronic Inc. Representative Darel

Untereker hadn't returned the Thompson's signed **"SECRECY/NON DISCLOSURE AND NON USE**

**AGREEMENT"** .  The letter shows Thompson concern about keeping their Mechanical Resuscitator confidential. Any information that we (Plaintiffs) provide would remain confidential unless Newair and Medtronic Inc. agree to provide the same information to a third party, in writing.

 Medtronic Inc. Representatives never mailed or faxed a signed agreement back to the Plaintiffs. Medtronic Inc. Representatives did not call or return phone calls. Thompson stop calling Medtronic Inc. Representative. Thompson felt that Medtronic Inc. was waiting to see if the Plaintiffs would receive a patent on their filed US patent application "499 patent". Thompson found out a few years later that Medtronic Inc. in-house inventors had filed a U.S Provisional Patent Application on February 14, 2003, then they file the regular US patent application 7308304B2 "304 patent" on August 29, 2003 with a chest compression device and a defibrillator.

See exhibit P

In Responds to Medtronic Inc. motion to dismiss, due to Misappropriation of the Plaintiffs allege trade secrets being illegally obtain.  The Plaintiffs totally disagree. The Plaintiffs trade secrets have been identified and the procedure used to protect the Plaintiffs trade secrets have been explained in the Plaintiffs responds. Plaintiffs request Medtronic Inc motion to dismiss be denied.

Plaintiffs never stated that the misappropriations of their trade secrets were obtained illegally. Medtronic Inc. was interested in the Plaintiffs Mechanical CPR Technology and Medtronic Inc received and accepted the Plaintiffs' Mechanical CPR Technology trade secrets but failed to secure those trade secrets and allowed the technology to be disclosed, used shared and sold trade secrets by Medtronic Inc and the other Defendants.

According to the United States Patent and Trademark Office (PTO) the definition of Inventorship

"[c]an be *simply* stated: "[t]he threshold question in determining inventorship is who conceived the invention. Unless a person contributes to the conception of the invention, he is not an inventor... [i]nsofar as defining an inventor is concerned, reduction to practice, *per se*, is irrelevant [except for simultaneous conception and reduction to practice] ...."

The United States has transitioned from a "first-to-invent" patent system to a "first-inventor-to-file" patent system. Plaintiff's "499 patent" applications was filed before March 16, 2013. The "499 Patent is still subject to the laws of the first-to-invent system. Under the first-to-invent regime, a person who contributed to the conception of an invention and diligently reduced the invention to practice could use the date of conception as the invention priority date 21

"Conception is the touchstone of inventorship, the completion of the mental part of invention." Burroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d 1223 (Fed. Cir. 1994).

35 USC 102 Originality means that the invention has not been derived from another inventor.[32] Section 102(f) required, in pertinent part, that "only a true and original inventor may obtain a patent."

The purpose of the originality requirement is to ensure that a person who is not a true inventor does not "reap the reward of exclusive rights to an invention." [63] There are two types of "true" inventors: sole inventors and joint inventors. If only one person contributes to the conception of an invention, then that person qualifies as a sole inventor.[64]

If more than one person contributes to the conception of an invention, then each person may qualify as a joint inventor.[72] The joint inventor statute, 35 U.S.C. § 116, provides that

"When an invention is made by two or more persons jointly, they shall apply for patent jointly and each make the required oath, except as otherwise provided in this title. Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent." 35 U.S.C. § 116 (2006).
Plaintiffs did not physically work together or at the same time but there was "some quantum of collaboration or connection" between joint inventors".

The facts will show that the plaintiffs collaborated with the named inventors, the facts will show that the plaintiff made a significant contribution to the conception of the invention, the facts will show that the plaintiff's contributions were corroborated, and the facts will show that the plaintiff made a contribution of at least one claim of the patent.

Thompson was told by Medtronic Inc. employee in 2011 that Jolife AB has had a contractual agreement with Medtronic since 2002. The Plaintiffs under Federal Rules of disclosure requested that specific contractual agreement be provided between Medtronic Inc and Jolife AB, Medtronic Inc and Physio Control/Physio-Control International, Medtronic Inc and Bain Capital Inc. Medtronic Inc and Stryker Inc. The Plaintiffs would like to if there was also a connection between Medtronic Inc and Medical University of LUND & LUND University.

The behavior between Medtronic Inc. and its employees, Physio-ContolInc/Physio-Control International and its employees, Jolife AB and its employees, LUND University and its Professor Stig Steen and his research team, Bain Capital and its employees, Plaintiffs and the named inventors created an in-house environment; whereupon, all the players were working under a Common Direction toward a common goal which was to create and industry around mechanical CPR Technology. *General Motors Corp. v. Tqyota Motor Co*

The named Inventors "699 Patent" merged the Plaintiff's neck positioning means claim into a previous patent application that was filed on March 21, 2002 and one day before Plaintiffs filed their patent application on March 22, 2002

In *General Motors Corp. v. Tqyota Motor Co.,so*

Page 14

Thus, in the context of in-house inventions, the collaboration element *may* be satisfied if joint inventors are working under common direction toward a common goal." "collaboration should be interpreted broadly in the context of in-house inventions". *General Motors Corp. v. Tqyota Motor Co*

### Response to page 8 page paragraph two (2).

Plaintiffs disagree; Plaintiffs are stating that none of their "499 patent "application information that was filed as a non published application on March 22, 2002 was not publically disclosed on March 23, 2002.

Under 35 USC 102; basically defines all Prior Art; whereas, section 103 define how to apply prior art in the contents of obviousness.  Prior art can be publications, publications in use and on sale.

Plaintiffs would fall under;

    a.   35 USC 102 (f), derivation from prior invention. Case "Oddz – On Toys"
    b.   35 USC 102 (g), Prior "invention" by another. Case "In Re bass"

Thompson and Holt conceived their prior art invention, prior to the named inventors "996 patent". Thompson and Holt prior art invention was placed in a non- published patent application on March 22, 2002 (499 patent).  The named inventors "996 patent" which has a priority date of November 17, 2003 was not filed in the United States until November 4, 2004. This would make the named inventors "996 patent "invalid; Unless, there was some collaboration or connection between Plaintiffs and the named inventors of the "996 patent".

Peter Sebelius and Martina Rosell are the named inventors of the "996 patent". Peter Sebelius is also one (1) of the three (3) inventors of the US patent application that was filed on March 21, 2002 and later issued US Patent 7,569,021 B2 ("021 patent") on August 4, 2009. It is called a "Rigid Support Structure On Two Legs For CPR". Why wasn't a continuation patent filed since both patent drawings are the same except the "996 patent"; which is, called a "Positioning device for use in apparatus for treating sudden cardiac arrest" has the stabilization strap.

Before the "996 patent" there was also a inventor named Stig Steen who filed a US provisional application on May 12, 2003 , then he file the US patent application on June 6, 2003 and later issued US patent  7226427 B2 ("427 patent") on June 5, 2007. It is called "System and procedures for treating cardiac arrest".

Medtronic Inc. inventors filed a US patent 7308304B2 "304 patent" application on August 23, 2003 and later issued US "304 patent" on December 11, 2007. The patent was called a "Cooperating defibrillators and external chest compression device". One of those inventors worked and or lived in Sweden during the time Medtronic Inc was showing an interest in the Plaintiffs "499 patent".

Page 15

When you look at the following patent drawings from earliest file date to the latest file date ("021 patent"; "427 patent";  " 304 patent";"996 patent" you will see the similarities in the structure being placed around the patient in each drawing. When you place the Plaintiffs "499 patent" with the three

above patents and look at all four patent drawings, there are similarity regarding the pump that is placed on the patient sternum; except, "499 patent" has a neck positioning means that is similar to "996 patent"

The "996 patent", is using the "021 patent's" drawing and attaching the "Positioning device for use in apparatus for treating sudden cardiac arrest", on it.

When you look at Inventor William T. Holt earlier US patent 5009226 "226 Patent" that was filed on May 14, 1990 and issued April 23, 1991 and compare it to inventor Clifton A. Alferness US patent 4349015 "015 patent" that was filed on Nov 14, 1990 and issued Sept 14, 1982; Alferness assigned his "015 patent" to Physio-Control Corporation which was owned by Bain Capital during the time Alferness was employee at Physio-Control. Then when you look at inventor Willy Vestung US patent 5693005 "005 patent" that was filed on Sept 22, 1994 and issued on Dec 2, 1997.Vestung approached Stig Steen with his "005 patent" an prototype and asked him to help him develop it.

The three patents "021 patent"; "427 patent"; "996 patent", all have been assigned to Jolife AB.

Inventor Peter Sebelius was working as research and development for Jolife AB. Jolife AB was funding Stig Steen and his research team. They were also working for LUND University Hospital. LUND University Hospital was also providing funding for Stig Steen and his research team.

When Stig Steen performed his Clinical Evaluation on the Lucas Chest Compression Device, Medtronic Inc. got involved in the Clinical Evaluation by providing its Trade Mark Medtronic Hall inlet valve to be used.

Jolife AB signed an exclusive marketing and distribution agreement with Medtronic Inc in 2004.

Medtronic Inc. owned Physio-Control/Physio-Control International during that time. Thompson received information that Medtronic Inc. and Jolife AB have had a contractual agreement since 2002.

Respectfully you Honor we need the court to have Medtronic Inc., Jolife AB and the other defendants to produce those documents so the Plaintiffs can respond to the Defendant's motion to dismiss correction of inventorship for lack of collaboration.   Plaintiffs requested that the Medtronic Motion be denied.

Plaintiffs request that all the Medtronic Inc. and the other defendant's motion to dismiss be denied. Plaintiffs compliant have clearly explained the facts.

Plaintiffs have stated in their complaint that some of the claims in the named inventors "996 patent" came from the Plaintiffs because they read upon the Plaintiffs prior art and placed an attachment device

to a previous file non-disclosed US patent application US 7569021B2 during the time that the Plaintiffs, Medtronic Inc. and their inventors, Jolife AB and their inventors, LUND University and their Professor s and Inventor were working on the same Mechanical CPR Technology

Plaintiffs non-published "499 patent" application information was not publically disclosed on March 22,

2002, It was disclose 18 months later when their non-published "499 patent" application was published on September 25, 2003.The publication disclosed the entire "499 patent" application. This would also fall under 35 USC 102 regarding the scope of disclosure of prior art; Explicit description and/or inherent description. Again this would make the named inventors "996 patent", invalid. Rosaire v. National Lead (5th Cir 1955).

Medtronic Inc. presented case Gen. Elec. V C0. V. Wilkins, 750 F.3d 1324, 1332 (Fed. Cir. 2014); as if, the case "subject matter" was referring to the Plaintiffs. The Plaintiffs totally disagree. The Gen. Elec. Co v. Wilkins case was based on Wilkins not being honest and refusing to cooperate. Wilkins did not produce credible testimony and without credible testimony there was nothing to corroborate. The district court nevertheless carefully and thoroughly analyzed all the evidence presented under the rule of reason stating that that case did not contain clear and convincing evidence showing that Wilkins the plaintiff did not make any inventive contribution to the claims.

Thompson and Holt are stating that they conceived the original invention and the claims in their issued "499 patent" is the proof. The named inventors of the "996 patent" attached the "499 patent" neck positioning means onto the named inventors "996 Patent" and later developed that part of the patent into a stabilization strap for the LUCAS Chest Compression Device.

See Exhibit Q (copy of all patents)

**Response to page 9 page paragraph one (1) and two (2).**

The history section regard Plaintiffs collaboration between Medtronic Inc., Jolife AB and inventor Peter Sebelius, University of Lund and inventor and professor Stig Steen and Physio-Control and Professor at Christian Brother University, Clinical Trial

In the Plaintiffs complaint section number 20; it is written

"On Friday, November 10, 2011 at 2 p.m., Medtronic/Physio-Control Representative, Ryan Landon called Thompson on his cell phone. During Thompson conversation with Mr. Ryan Landon. Mr. Landon provided the **connection** between Medtronic Inc and Jolife AB. Mr. Ryan Landon admitted that Medtronic/Physio-Control and Jolife AB have had a contractual agreement since 2002."

Page 17

It is written in Medtronic Inc. Motion to dismiss on Paragraph one (1) on Page 9,

"It is unreasonable to infer that--- at the time the "996 patent was filed (November 2003)--- the relationship between Medtronic and Jolife was anything more than a distribution relationship. It is just as unreasonable to infer that Medtronic would have shared any information, like the alleged by Plaintiffs, with Jolife given their attenuated relationship at the time."

In Medtronic Inc. written motion to dismiss, Medtronic Inc. is admitting that a contractual agreement was in place during the time that Medtronic Inc. Representative was soliciting Thompson. "Medtronic

was more interested in Thompson's CPR Device, than the Medtronic Device that was also being presented at the same public presentation." (Plaintiffs Complaint section number 13.)

In **Medtronic Inc.**'s., motion regarding Medtronic "attenuated relationship  at the time" with Jolife, the motion is written in an attempt to play down the seriousness of this needed "distribution relationship" document. **Medtronic** and Jolife were more than just a distribution relationship.  Medtronic and Jolife had a potential multimillion dollar marketing agreement tied into that distribution agreement.

The Plaintiffs are requesting that your Honor require Medtronic Inc., Jolife AB, Physi-Control Inc./Physio-Control International and the other defendants to provide the contractual agreements needed for the Plaintiffs to reasonably prepare a responsive to Medtronic Motion to dismiss regarding collaboration.

The **Medtronic Inc.** motion never talked about the significant contributions Thompson and Holt made to the original conception of the "996 patent". Nor did Medtronic Inc. motion talk about corroborating evidence that was presented in the complaint which would prove Thompson and Holt did contribute to the original conception of the "996 patent", nor did Medtronic Inc. motion talk about how Thompson and Holt contributed to the original conception of the subject matter of a claim or claims to the "996 patent".  The elements need to prove sole inventorship and or joint inventorship has been presented in the Plaintiffs complaint in regards to collaboration, contribution, corroboration and claims.

**<u>Brief History Regarding Collaboration and Connection Between Thompson, Holt and the Named Inventors to"996 Patent".</u>**

Plaintiff's Complaint under **<u>Factual Background</u>** numbered paragraph 44, it mentioned that StigSteen published the first journal article on LUCAS ™.  LUCAS means "Lund University Cardiopulmonary Assist System". Lund University was representing the "Lucas Chest Compression Device". Professor StigSteen received economic support from Lund University Hospital and built a pneumatic universal machine where all relevant parameters for chest compression and decompression could be studied in pigs of all sizes. In that research, clinical evaluation was performed on the Lucas Chest Compression Device. The completed clinical evaluation was called "Evaluation of LUCAS, a new device for automatic mechanical compression and active decompression resuscitation" In that evaluation it lists the material and methods that were used. Medtronic Inc. provided their inlet valve called (Vi) (Medtronic Hall, mitral

valve, 29 mm0) which was inserted between the reservoir and the connection of the soft bag that was being used. This help in the monitoring of the flow and pressure signals that were being sampled on a computer. See Exhibit R.

Thompson communicated with Medtronic Inc. to find out what type of protocol Medtronic Inc. would have had in place in 2002; regarding the Clinical Evaluation using their patented trademark name and products. Thompson received the following email

See Exhibit S

The history of Mr. Stig Steen and his association with the LUCAS Device, Medtronic Inc. Jolife AB, name inventor Peter Sebelius  and how they are connection with the Plaintiffs new Mechanical Resuscitation Device.

See Liao. Q. (2011) LUCAS-Lund University Cardiopulmonary Assist System Department of Cardiothoracic Surgery, Clinical Sciences, Lund University.

## "History of LUCAS

Willy Vistung was a Norwegian inventor. Once he happened to see the treatment of a patient with cardiac arrest in an ambulance speeding very fast through Oslo toward the hospital. One paramedic tried to give chest compressions, kneeling over the patient, losing his balance every time the ambulance rounded a corner. Another person gave ventilation with an AmbuBag connected to a cylinder with oxygen. Willy Vistung had the idea during this ambulance transport of constructing a pneumatic mechanical system to do chest compressions. He bought the necessary components and made his first prototype. No enthusiasm for his project was to be found in Norway. In 1995 he had a meeting with **Stig Steen** at the Department of Cardiothoracic Surgery in Lund. **Stig Steen**, also a Norwegian, was a cardiothoracic surgeon in charge of the cardiothoracic surgical laboratory, situated within **Lund University Hospital.Stig Steen** had never met Willy Vistung before, but the personal chemistry between them was perfect. Ethical permission was obtained to run a randomized study on pigs to test Willy Vistung's prototype, and the result of that study showed that mechanical compressions with his device gave superior results as compared to manual compressions. Willy Vistung became the victim of cardiac arrest and died. **Stig Steen** and coworkers, in full agreement with Vistung's widow, andwith economic support from Lund University Hospital, built a pneumatic universal machine where all relevant parameters for chest compression and decompression could be studied in pigs of all sizes (Fig 2-3). The results obtained with optimal mechanical chest compression/decompression were superior to manual CPR. **Professor Steen** contacted the Swedish industry entrepreneur Lars Sunnanväder, the owner of Jostra AB, a company producing heart-lung machines in Lund. Lars Sunnanväder and Jostra's CEO, Lennart Sjölund, enthusiastically supported the plans to make industry out of **mechanical CPR**, and Sunnanväder started a **new company, Jolife AB,** for this purpose. **Professor Steen** and his research team were given **generous economic support** from Jolife to continue the research and test different new prototypes (Fig 4-5). The first commercial version needed a name, and LUCAS was chosen, which stands for Lund University Cardiopulmonary Assist System. "

Professor Stig Steen had a research team. They were receiving generous economic supported fromJolife AB, to continue the research on mechanical CPR and test different new prototypes. Name inventor Peter Sebelius was a Manager-Research & Development forJolife AB during this time. Both Professor Stig Steen and Peter Sebelius filed U.S. Patent Applications and received issued U.S. Patents that they assigned to Jolife AB.  Some of those patents were centered around the development of Mechanical CPR (Cardiopulmonary Resuscitation) devices. JolifeAB owner Mr. Lars Sunnanvader started the company in

Page 19

2000 and his CEO Lennart Sjolund enthusiastically supported the plans to make an industry out of mechanical CPR.Plaintiff, the late Mr. William T. Holt filed a US Patent Application on May 14, 1990 and received an issued U.S. Patent 5009226A on April 23, 1991. The name of the US Patent was called "Mechanical Resuscitator".Mr. Holt did not file a patent application outside the United States regarding his US Patent 5009226A; But, when you look at some of the drawing that were present by Stig Steen and Peter Sebelius, they are similar to Mr. Holt drawings that were included in his 1991 issued patent. Seeexhibit C. When you go to the USPTO and type in Mechanical Resuscitator Mr. William T. Holt U.S Patent is listed. It is hard for me to believe that these individuals were not aware of his invention that was filed many years before they started performing research and testing different new prototypes."

The Complaint did not fail to state a cause of action for correction of inventorship. Plaintiffs is requesting the court to have Medtronic Inc. and the other Defendants to produce Clinical Evaluation Agreements, Collaboration Agreements, Marketing and Distribution Agreements, Licensing Agreement in the early 2000, 2001, 2002, 2003, 2004 and 2005. Medtronic Inc had a place at the table during the 2002 Clinical Evaluation where Stig Steen and other scientist evaluating the Lucas Chest Compression Device. Medtronic trade mark and possibly patented product was being used. Plaintiffs have always stated that there was collaboration between Thompson , Holt and the named inventors. Absent some element of joint behavior, or at least some quantum of collaboration between the named and unnamed inventors, there can be no joint inventor ship under 35 U.S.C. § 116. Medtronic Inc created and implied contract with the Plaintiffs. During that time Medtronic Inc had a contractual relationship with Jolife and the inventors. During that time, the plaintiffs Medtronic Inc. Jolife AB and the other defendants were working under a common direction towards a common goal which was to create an industry around Mechanical CPR Technology.  The named inventors "996 patent" merged and/or combined Plaintiffs Mechanical CPR Technology "499 patent" into another prior art patent application "021 patent" and received a "996 patent".

The Complaint did not fail to state a cause of action for correction of inventorship because there were allegations of collaboration between Mr. Thompson and Mr. Holt and the named inventors who assigned their rights to Jolife AB that has assigned their rights to Physio-Control/Physio-Control International. Plaintiffs stated that the Plaintiffs and the defendants were not totally independent and they were not completely unaware of each other's work. There was a minimum amount of some collaboration. The question should be; was the collaboration direct or indirect and was that communication formal or informal?

Only true and original inventors are eligible to apply for patents, a requirement that protects both the actual inventors and the public. Only those who actually invest energy in the inventive process should benefit from the advantages bestowed by the patent system. The Patent in question fall under the old law where original inventor who actual invest energy should be the inventor.

"The collaboration may be in the form of direct or indirect communication. As to
A, B and C, the requirement for collaboration can exist if:
  i.        A communicates with B, and B communicates with C;
  ii.       A, B and C are part of same research or development team;
  iii.      A, B and C are working under common direction;
  iv.       A builds upon a research report or invention record of B and C; and
  v.        A and B learn of a suggestion by C in a meeting."

The Plaintiffs Complaint clearly states that Thompson and the late Holt did not work together physically
with the named inventor "996 patent".

Furthermore, the court stated that "there must be some Element of joint behavior, such as collaboration
**OR.**

Federal court established that collaboration can be

1.  underline working under common direction, one inventor seeing a relevant report and building upon it
2.  hearing another's suggestion at a meeting

3.  according to Kimberly-Clark Corp. v. Procter &Gamble Distributing Co.,

Yes, Thompson was aware of the named inventors "996 patent". The Plaintiffs have stated that the
information the was obtaining from the Plaintiffs invention "499 patent" was a trade secret before and
after the filing date March 22, 2002. It was a US" non published patent application" for 18 months. The
trade secret information was used by the named inventors (Peter Sebelius and Martina Rosell) who
incorporated it into the "021patent" that was assigned to Jolife AB to create "996 patent" that was also
assigned to Jolife AB. Those named inventors used the Plaintiff's information by seeing, reading and or
hearing the relevant information at a meeting. According to the Federal courts that is collaboration. The
next element would be; were the inventors aware of each other's work and when.

The next issue is; When did Thompson become aware of the unnamed inventors?

Thompson and his wife, Phyllis Thompson filed a US Patent 7032596B2 "596 patent" application on April
6, 2004 called "Cardiopulmonary Resuscitation Device and Method" and received their issued patent on
April 25, 2006.

Jolife AB "996 patent" with the foreign priority date of November 17, 2003 was filed in the United States
on November 4, 2004. The patent was issued on November 30, 2010.

During the US Patent examiner's process of Thompson and Holt '499 patent' and Thompson and Phyllis "
596 patent" were issued US patents the same year 2006. Thompson noticed that inventor Stig Steen US
patent 7226427B2 " 427 patent" application and the patent had been assigned to Jolife AB. It was
similar to the Plaintiffs "499 patent". Thompson realizing that Jolife AB was located in Sweden and since
Thompson and Holt never filed their patent outside of the United States; Thompson realized that he

couldn't do anything about it. The Lucas Chest Compression Device with the stabilization strap was attached later. Found out about Jolife earlier Over the years Thompson monitored the internet and the market to see if the product that Jolife AB was marketing would come to the United States. Thompson also discovered that the first Lucas Chest Compression product that Jolife AB placed on the market did not have the stabilization strap.

Remember the "996 patent" was filed outside of the United States on November 17, 2003; 52 days after Jolife AB "021 patent" and Thompson and Holt "499 patent" were publicly published on the same month, day and year (September 25, 2003)in the USPTO Gazette.

Thompson noticed Jolife AB patent application on "021 patent" but didn't think much about it at the time because Peter Sebelius and the other two inventors had filed one day before Thompson and Holt and it didn't have a neck positioning means. Also Thompson was not familiar with the different patent

laws regarding first to Invent, prior art, the procedure required to respond to prior art est.

In 2011, Thompson looked on the internet and discovered that Medtronic Inc. had purchased Jolife AB. Thompson realizing that this product would be coming to the United States, whereupon, Thompson immediately contacted his patent attorney. Thompson patent attorney at that time examined the "499 patent" claims and compared them to the product, Lucas Chest Compression Device. Thompson patent attorney advised that the product was infringing on the neck position means but not all the elements in the independent claims. He was advised that the product would not infringing the "499 patent"

Thompson contacted Medtronic Inc. Representative from Medtronic Inc/Physio-Control who advised Thompson about the connection between Medtronic Inc and Jolife AB. These companies have had a contractual relationship since 2002.

It is possible through error or mistake that this incident occurred; and, it is also possible that the original inventors of the invention through conception are the sole Inventors of the "996 patent" other patents and products associated with the "996 patent".

"One does not qualify as a joint inventor by merely assisting the actual inventor after conception of the claimed invention." Ethicon, Inc. v. United States Surgical Corp., 135 F.3d 1456 (Fed. Cir. 1998)."

**Argument**

I.      **Plaintiffs fail to state a claim for relief.**

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiffs hereby submit its opposition to Defendants' Motion to Dismiss the Complaint with Prejudice. Complaint not only meets but exceeds the standards governing the form of a complaint contemplated by Federal Rule of Civil Procedure 8(a), this Court has subject matter jurisdiction in this matter, and the Complaint sufficiently alleges the claims of breach of contract, misappropriated trade secrets, unjust enrichment, and correction of inventorship accordingly, Defendants' motion should be denied.

I.      The Plaintiffs claims are sufficiently stated.

Defendants move to dismiss the Plaintiffs Complaint for a) Failure to plead "enough facts to state a claim to a relief that is plausible on its face". In support of their Motion, Defendant argue that the Complaint lacks a factual basis. Federal Rule of Civil Procedure 8(a) states that a complaint should contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and that "[e]ach allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). The Supreme Court has explained that a complaint need only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002); accord Atchison, Topeka & Santa Fe Ry. v. Buell, 480 U.S. 557, 568 n.15 (1987) (under Federal Rule 8, claimant has "no duty to set out all of the relevant facts in his complaint"). "Specific facts are not necessary in a Complaint; instead, the statement needs only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Epos Tech., 636 F. Supp.2d 57, 63 (D.D.C. 2009) (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 555 (2007)).

Thus, the Federal Rules embody "notice pleading" and require only a concise statement of the claim, rather than evidentiary facts. Accordingly, Defendants' Motion would be considered properly filed only "where a plaintiff's complaint is 'unintelligible [le] (sic),' not where a complaint suffers for 'lack of detail.'" Epos Tech., 636 F. Supp. 2d at 63 (citations omitted). The simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and to dispose of unmeritorious claims. See Swierkiewicz, 534 U.S. at 512. Indeed, courts have found that if the information sought by the motion is obtainable through discovery, the motion should be denied. See, e.g., Towers Tenant Ass'n v. Towers Ltd. P'ship, 563 F. Supp. 566, 569 (D.D.C. 1983) (denying motion for a more definite statement because details such as "dates, times, names and places" are "the central object of discovery, and need not be pleaded") Courts are to assume that plaintiffs' well-pled factual allegations are true, and to view those facts in the light most favorable to them. *Meador v. Cabinet for Human Resources*, 902F.2d 474, 475 (6th Cir. 1990).

Personal Jurisdiction and subject matter jurisdiction has been satisfied under 28 USC & 1331 and 28 USC & 1337.

**CONCLUSION**

For all the foregoing reasons, the Plaintiffs respectfully request that the Complaint filed against the Stryker Defendants not be dismissed for lack of personal jurisdiction. The Plaintiffs motion to deny Stryker Defendants motion to dismiss Complaint in its entirety for failure to state a claim.